# NORTHWESTERN STATES PORTLAND CEMENT CO. *v.* MINNESOTA.

No. 12.   Argued October 14, 1958.—Decided February 24, 1959.*

*Together with No. 33, *Williams, State Revenue Commissioner,* v. *Stockham Valves & Fittings, Inc.,* on certiorari to the Supreme Court of Georgia, argued October 14–15, 1958.

*Joseph A. Maun* argued the cause for appellant in No. 12. With him on the brief was *Earl Smith.*

*Ben F. Johnson,* Deputy Assistant Attorney General of Georgia, argued the cause for petitioner in No. 33. With him on the brief were *Eugene Cook,* Attorney General, *Broadus B. Zellars, Hugh Gibert* and *Robert H. Walling,* Deputy Assistant Attorneys General.

*Perry Voldness,* Assistant Attorney General of Minnesota, argued the cause for appellee in No. 12. With him on the brief were *Miles Lord,* Attorney General, and *Arthur C. Roemer,* Special Assistant Attorney General.

*John Izard, Jr.* argued the cause for respondent in No. 33. With him on the brief were *William K. Meadow* and *Joseph H. Johnson, Jr.*

*Edmund G. Brown,* Attorney General, and *James E. Sabine,* Assistant Attorney General, filed a brief for the State of California, as *amicus curiae,* in support of appellee in No. 12. *Thomas D. McBride,* Attorney General, and *Edward Friedman,* Deputy Attorney General, filed a brief for the State of Pennsylvania, as *amicus curiae,* in No. 12.

*Lambert H. Miller* and *Alan M. Nedry* filed a brief for the National Association of Manufacturers of the United States of America, as *amicus curiae,* in support of respondent in No. 33.

Mr. Justice Clark delivered the opinion of the Court.

These cases concern the constitutionality of state net income tax laws levying taxes on that portion of a foreign corporation's net income earned from and fairly apportioned to business activities within the taxing State when those activities are exclusively in furtherance of interstate commerce. No question is raised in either case as to the reasonableness of the apportionment of net income under the State's formulas nor to the amount of the final assessment made. The Minnesota tax was upheld by its Supreme Court, 250 Minn. 32, 84 N. W. 2d 373, while the Supreme Court of Georgia invalidated its statute as being violative of "both the commerce and due-process clauses of the Federal Constitution . . . ." 213 Ga. 713, 721, 101 S. E. 2d 197, 202. The importance of the question in the field of state taxation is indicated by the fact that thirty-five States impose direct net income taxes on corporations. Therefore, we noted jurisdiction of the appeal in the *Minnesota* case, 355 U. S. 911 (1958), and granted certiorari in the other, 356 U. S. 911 (1958). Although the cases were separately briefed, argued, and submitted, we have, because of the similarity of the tax in each case, consolidated them for the purposes of decision. It is contended that each of the state statutes, as applied, violates both the Due Process and the Commerce Clauses of the United States Constitution. We conclude that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same.

## No. 12.—*Northwestern States Portland Cement Co.* v. *State of Minnesota.*

This is an appeal from judgments of Minnesota's courts upholding the assessment by the State of income taxes for the years 1933 through 1948 against appellant, an Iowa corporation engaged in the manufacture and sale of cement at its plant in Mason City, Iowa, some forty miles from the Minnesota border. The tax was levied under § 290.03 [1] of the Minnesota Statutes which imposes an annual tax upon the taxable net income of residents and nonresidents alike. One of four classes taxed by the statute is that of "domestic and foreign corporations . . . whose business within this state during the taxable year consists exclusively of foreign commerce, interstate commerce, or both." Minnesota has utilized three ratios in determining the portion of net income taxable under its law.[2] The first is that of the taxpayer's sales assignable to Minnesota during the year to its total sales during that period made everywhere; the second, that of the taxpayer's total tangible property in Minnesota for the year to its total tangible property used in the business that year wherever situated. The third is the tax-

---

[1] § 290.03:

"Classes of taxpayers. An annual tax for each taxable year, computed in the manner and at the rates hereinafter provided, is hereby imposed upon the taxable net income for such year of the following classes of taxpayers:

"(1) Domestic and foreign corporations not taxable under section 290.02 which own property within this state or whose business within this state during the taxable year consists exclusively of foreign commerce, interstate commerce, or both;

"Business within the state shall not be deemed to include transportation in interstate or foreign commerce, or both, by means of ships navigating within or through waters which are made international for navigation purposes by any treaty or agreement to which the United States is a party; . . . ." Minn. Stat., 1945, § 290.03.

[2] Minn. Stat. (1945), § 290.19.

payer's total payroll in Minnesota for the year to its total payroll for its entire business in the like period. As we have noted, appellant takes no issue with the fairness of this formula nor of the accuracy of its application here.

Appellant's activities in Minnesota consisted of a regular and systematic course of solicitation of orders for the sale of its products, each order being subject to acceptance, filling and delivery by it from its plant at Mason City. It sold only to eligible dealers, who were lumber and building material supply houses, contractors and ready-mix companies. A list of these eligible dealers was maintained and sales would not be made to those not included thereon. Forty-eight percent of appellant's entire sales were made in this manner to such dealers in Minnesota. For efficient handling of its activity in that State, appellant maintained in Minneapolis a leased sales office equipped with its own furniture and fixtures and under the supervision of an employee-salesman known as "district manager." Two salesmen, including this district manager, and a secretary occupied this three-room office. Two additional salesmen used it as a clearing house. Each employee was paid a straight salary by the appellant direct from Mason City and two cars were furnished by it for the salesmen. Appellant maintained no bank account in Minnesota, owned no real estate there, and warehoused no merchandise in the State. All sales were made on a delivered price basis fixed by the appellant in Mason City and no "pick ups" were permitted at its plant there. The salesmen, however, were authorized to quote Minnesota customers a delivered price. Orders received by the salesmen or at the Minneapolis office were transmitted daily to appellant in Mason City, were approved there, and acknowledged directly to the purchaser with copies to the salesman.

In addition to the solicitation of approved dealers, appellant's salesmen also contacted potential customers

and users of cement products, such as builders, contractors, architects, and state, as well as local government purchasing agents. Orders were solicited and received from them, on special forms furnished by appellant, directed to an approved local dealer who in turn would fill them by placing a like order with appellant. Through this system appellant's salesmen would in effect secure orders for local dealers which in turn were filled by appellant in the usual manner. Salesmen would also receive and transmit claims against appellant for loss or damage in any shipments made by it, informing the company of the nature thereof and requesting instructions concerning the same.

No income tax returns were filed with the State by the appellant. The assessments sued upon, aggregating some $102,000, with penalties and interest, were made by the Commissioner of Taxation on the basis of information available to him.

No. 33.—*T. V. Williams, Commissioner,* v. *Stockham Valves & Fittings, Inc.*

The respondent here is a Delaware Corporation with its principal office and plant in Birmingham, Alabama. It manufactures and sells valves and pipe fittings through established local wholesalers and jobbers who handle products other than respondent's. These dealers were encouraged by respondent to carry a local inventory of its products by granting to those who did so a special price concession. However, the corporation maintained no warehouse or storage facilities in Georgia. It did maintain a sales-service office in Atlanta, which served five States. This office was headquarters for one salesman who devoted about one-third of his time to solicitation of orders in Georgia. He was paid on a salary-plus-commission basis while a full-time woman secretary employed there received a regular salary only. She was "a source of

information" for respondent's products, performed steno-
graphic and clerical services and "facilitated communica-
tions between the . . . home office in Birmingham, . . .
[the] sales representative . . . and customers, prospec-
tive customers, contractors and users of [its] products."
Respondent's salesman carried on the usual sales activi-
ties, including regular solicitation, receipt and forwarding
of orders to the Birmingham office and the promotion of
business and good will for respondent. Orders were taken
by him, as well as the sales-service office, subject to
approval of the home office and were shipped from Bir-
mingham direct to the customer on an "f. o. b. warehouse"
basis. Other than office equipment, supplies, advertis-
ing literature and the like, respondent had no property in
Georgia, deposited no funds there and stored no merchan-
dise in the State.

Georgia levies a tax [3] on net incomes "received by every
corporation, foreign or domestic, owning property or doing

---

[3] Ga. Code Ann. (1937), § 92-3102.

"Rate of taxation of corporations.—Every domestic corporation
and every foreign corporation shall pay annually an income tax
equivalent to five and one-half per cent. of the net income from
property owned or from business done in Georgia, as is defined in
section 92-3113: . . ."

Ga. Code Ann. (1937), § 92-3113.

"Corporations, allocation and apportionment of income.—The
tax imposed by this law shall apply to the entire net income, as
herein defined, received by every corporation, foreign or domestic,
owning property or doing business in this State. Every such corpora-
tion shall be deemed to be doing business within this State if it
engages within this State in any activities or transactions for the
purpose of financial profit or gain, whether or not such corporation
qualifies to do business in this State, and whether or not it maintains
an office or place of doing business within this State, and whether
or not any such activity or transaction is connected with interstate
or foreign commerce. . . ."

business in this State."[4] The Act defines the latter as including "any activities or transactions" carried on within the State "for the purpose of financial profit or gain" regardless of its connection with interstate commerce. To apportion net income, the Act applies a three-factor ratio based on inventory, wages and gross receipts. Under the Act the State Revenue Commissioner assessed and collected a total of $1,478.31 from respondent for the taxable years 1952, 1954 and 1955, and after claims for refund were denied the respondent filed this suit to recover such payments. It bases its right to recover squarely upon the constitutionality of Georgia's Act under the Commerce and the Due Process Clauses of the Constitution of the United States.

That there is a "need for clearing up the tangled underbrush of past cases" with reference to the taxing power of the States is a concomitant to the negative approach resulting from a case-by-case resolution of "the extremely limited restrictions that the Constitution places upon the states. . . ." *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 445 (1940). Commerce between the States having grown up like Topsy, the Congress meanwhile not having undertaken to regulate taxation of it, and the States having understandably persisted in their efforts to get some return for the substantial benefits they have afforded it, there is little wonder that there has been no end of cases testing out state tax levies. The resulting judicial application of constitutional principles to specific state statutes leaves much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation. This Court alone has handed down some three hundred full-dress

---

[4] The tax on corporations is part of a general scheme of income taxation which Georgia imposes on individuals (§ 92–3101), corporations (§ 92–3102), and fiduciaries (§ 92–3103).

opinions spread through slightly more than that number of our reports. As was said in *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, 344 (1954), the decisions have been "not always clear . . . consistent or reconcilable. A few have been specifically overruled, while others no longer fully represent the present state of the law." From the quagmire there emerge, however, some firm peaks of decision which remain unquestioned.

It has long been established doctrine that the Commerce Clause gives exclusive power to the Congress to regulate interstate commerce, and its failure to act on the subject in the area of taxation nevertheless requires that interstate commerce shall be free from any direct restrictions or impositions by the States. *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824). In keeping therewith a State "cannot impose taxes upon persons passing through the state, or coming into it merely for a temporary purpose" such as itinerant drummers. *Robbins* v. *Taxing District,* 120 U. S. 489, 493–494 (1887). Moreover, it is beyond dispute that a State may not lay a tax on the "privilege" of engaging in interstate commerce, *Spector Motor Service* v. *O'Connor,* 340 U. S. 602 (1951). Nor may a State impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage to local business, *Memphis Steam Laundry* v. *Stone,* 342 U. S. 389 (1952); *Nippert* v. *Richmond,* 327 U. S. 416 (1946), or by subjecting interstate commerce to the burden of "multiple taxation," *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U. S. 157 (1954); *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307 (1938). Such impositions have been stricken because the States, under the Commerce Clause, are not allowed "one single-tax-worth of direct interference with the free flow of commerce." *Freeman* v. *Hewit,* 329 U. S. 249, 256 (1946).

On the other hand, it has been established since 1918 that a net income tax on revenues derived from interstate

commerce does not offend constitutional limitations upon state interference with such commerce. The decision of *Peck & Co.* v. *Lowe,* 247 U. S. 165, pointed the way. There the Court held that though true it was that the Constitution provided "No Tax or Duty shall be laid on Articles exported from any State," Art. I, § 9, still a net income tax on the profits derived from such commerce was not "laid on articles in course of exportation or on anything which inherently or by the usages of commerce is embraced in exportation or any of its processes. . . . At most, exportation is affected only indirectly and remotely." *Id.,* at 174–175. The first case in this Court applying the doctrine to interstate commerce was that of *U. S. Glue Co.* v. *Town of Oak Creek,* 247 U. S. 321 (1918). There the Court distinguished between an invalid direct levy which placed a burden on interstate commerce and a charge by way of net income derived from profits from interstate commerce. This landmark case and those usually cited as upholding the doctrine there announced, *i. e., Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113 (1920), and *Memphis Gas Co.* v. *Beeler,* 315 U. S. 649 (1942), dealt with corporations which were domestic to the taxing State (*U. S. Glue Co.* v. *Town of Oak Creek, supra*), or which had "established a commercial domicile" there, *Underwood Typewriter Co.* v. *Chamberlain, supra; Memphis Gas Co.* v. *Beeler, supra.*

But that the presence of such a circumstance is not controlling is shown by the cases of *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Commission,* 266 U. S. 271 (1924), and *Norfolk & W. R. Co.* v. *North Carolina,* 297 U. S. 682 (1936). In neither of these cases was the taxpayer a domiciliary of the taxing State, incorporated or with its principal place of business there, though each carried on substantial local activities. Permitting the assessment of New York's franchise tax measured on a proportional formula against a British corporation selling ale in New

York State, the Court held in *Bass, Ratcliff & Gretton, Ltd., supra,* that "the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—the process of manufacturing resulting in no profits until it ends in sales—the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business." *Id.,* at 282. Likewise in *Norfolk & W. R. Co., supra,* North Carolina was permitted to tax a Virginia corporation on net income apportioned to North Carolina on the basis of mileage within the State. These cases stand for the doctrine that the entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs. In fact, in *Bass, Ratcliff & Gretton* the operations in the taxing State were conducted at a loss, and still the Court allowed part of the over-all net profit of the corporation to be attributed to the State. A reading of the statute in *Norfolk & W. R. Co.* reveals further that one facet of the apportionment formula was specifically designed to attribute a portion of the interstate hauls to the taxing State.

Any doubt as to the validity of our position here was entirely dispelled four years after *Beeler,* in a unanimous *per curiam* in *West Publishing Co.* v. *McColgan,* 328 U. S. 823, citing the four cases of *Beeler, U. S. Glue Co.,* both *supra, Interstate Busses Corp.* v. *Blodgett,* 276 U. S. 245 (1928), and *International Shoe Co.* v. *Washington,* 326 U. S. 310 (1945). The case involved the validity of California's tax on the apportioned net income of West Publishing Company, whose business was exclusively interstate. See 27 Cal. 2d 705, 166 P. 2d 861. While the statement of the facts in that opinion recites that "The

employees were given space in the offices of attorneys in return for the use of plaintiff's books stored in such offices," it is significant to note that West had not qualified to do business in California and the State's statute itself declared that the tax was levied on income derived from interstate commerce within the State, as well as any arising intrastate. The opinion was not grounded on the triviality that office space was given West's soliciters by attorneys in exchange for the chanceful use of what books they may have had on hand for their sales activities. Rather, it recognized that the income taxed arose from a purely interstate operation.

> "In relying on the foregoing cases for the proposition that a foreign corporation engaged within a state solely in interstate commerce is immune from net income taxation by that state, plaintiff [West Publishing Co.] overlooks the distinction made by the United States Supreme Court between a tax whose subject is the privilege of engaging in interstate commerce and a tax whose subject is the net income from such commerce. It is settled by decisions of the United States Supreme Court that a tax on net income from interstate commerce, as distinguished from a tax on the privilege of engaging in interstate commerce, does not conflict with the commerce clause." 27 Cal. 2d 705, 708–709, 166 P. 2d 861, 863. (Citations omitted.)

We believe that the rationale of these cases, involving income levies by States, controls the issues here. The taxes are not regulations in any sense of that term. Admittedly they do not discriminate against nor subject either corporation to an undue burden. While it is true that a State may not erect a wall around its borders preventing commerce an entry, it is axiomatic that the founders did not intend to immunize such commerce from

carrying its fair share of the costs of the state government in return for the benefits it derives from within the State. The levies are not privilege taxes based on the right to carry on business in the taxing State. The States are left to collect only through ordinary means. The tax, therefore, is "not open to the objection that it compels the company to pay for the privilege of engaging in interstate commerce." *Underwood Typewriter Co.* v. *Chamberlain, supra,* at 119. As was said in *Wisconsin* v. *Minnesota Mining & Mfg. Co.,* 311 U. S. 452, 453 (1940), "it is too late in the day to find offense to that [commerce] Clause because a state tax is imposed on corporate net income of an interstate enterprise which is attributable to earnings within the taxing state . . . ."

While the economic wisdom of state net income taxes is one of state policy not for our decision, one of the "realities" raised by the parties is the possibility of a multiple burden resulting from the exactions in question. The answer is that none is shown to exist here. This is not an unapportioned tax which by its very nature makes interstate commerce bear more than its fair share. As was said in *Central Greyhound Lines* v. *Mealey,* 334 U. S. 653, 661 (1948), "it is interstate commerce which the State is seeking to reach and . . . the real question [is] whether what the State is exacting is a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation." The apportioned tax is designed to meet this very requirement and "to prevent the levying of such taxes as will discriminate against or prohibit the interstate activities or will place the interstate commerce at a disadvantage relative to local commerce." *Id.,* at 670. Logically it is impossible, when the tax is fairly apportioned, to have the same income taxed twice. In practical operation, however, apportionment formulas being what they are, the possibility of the contrary is not foreclosed, especially

by levies in domiciliary States.[5] But that question is not before us. It was argued in *Northwest Airlines* v. *Minnesota,* 322 U. S. 292 (1944), that the taxation of the entire fleet of its airplanes in that State would result in multiple taxation since other States levied taxes on some proportion of the full value thereof. The Court rejected this contention as being "not now before us" even though other States actually collected property taxes for the same year from Northwest upon "some proportion" of the full value of its fleet.[6] Here the records are all to the contrary. There is nothing to show that multiple taxation is present. We cannot deal in abstractions. In this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense. This they have failed to do.

It is also contended that *Spector Motor Service* v. *O'Connor,* 340 U. S. 602 (1951), requires a contrary result. But there it was repeatedly emphasized that the tax was "imposed upon the franchise of a foreign corporation for the privilege of doing business within the State . . . ." Thus, it was invalid under a long line of precedents, some of which we have mentioned.[7] It was not a levy on net

---

[5] In *Standard Oil Co.* v. *Peck,* 342 U. S. 382 (1952), we struck down Ohio's *ad valorem* property tax on vessels domiciled there but plying in interstate trade because it was not apportioned.

[6] The Court nevertheless pointed out that such payments did "not abridge the power of taxation of . . . the home State." 322 U. S., at 295.

[7] See also *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203, 216 (1925), where this Court, striking down a Massachusetts excise tax on a foreign corporation engaged exclusively in interstate commerce, noted that "[t]he right to lay taxes on tangible property or on income is not involved; . . ."

Furthermore, none of the cases which the dissent relies on for the proposition that "[N]o State has the right to lay a tax on interstate commerce in any form . . . ," was a net income tax case. In fact, all involved taxes levied upon corporations for the privilege of engag-

464

income but an excise or tax placed on the franchise of a foreign corporation engaged "exclusively" in interstate operations. Therefore, with the exception of *Beeler*, heretofore mentioned, the Court made no reference to the net-income-tax cases which control here. We do not construe that reference as intended to impair the validity of the *Beeler* opinion. Nor does it reach our problem. The taxes here, like that in *West Publishing Co.* v. *McColgan, supra,* are based only upon the net profits earned in the taxing State. That incidence of the tax affords a valid "constitutional channel" which the States have utilized to "make interstate commerce pay its way." In *Spector* the incidence was the privilege of doing business, and that avenue of approach had long been declared unavailable under the Commerce Clause. As was said in *Spector,* "taxes may be imposed although their payment may come out of the funds derived from petitioner's interstate business, provided the taxes are so imposed that their burden will be reasonably related to the powers of the State and [are] non-discriminatory." 340 U. S., at 609. We find that the statutes here meet these tests.

Nor will the argument that the exactions contravene the Due Process Clause bear scrutiny. The taxes imposed are levied only on that portion of the taxpayer's net income which arises from its activities within the taxing State. These activities form a sufficient "nexus between such a tax and transactions within a state for which the tax is an exaction." *Wisconsin* v. *J. C. Penney Co., supra,* at 445. It strains reality to say, in terms of our

ing in interstate commerce. This Court has consistently held that the "privilege" of engaging in interstate commerce cannot be granted or withheld by a State, and that the assertion of state power to tax the "privilege" is, therefore, a forbidden attempt to "regulate" interstate commerce. Cf. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 112–113 (1943).

decisions, that each of the corporations here was not sufficiently involved in local events to forge "some definite link, some minimum connection" sufficient to satisfy due process requirements. *Miller Bros.* v. *Maryland,* 347 U. S. 340, 344–345 (1954). See also *Ott* v. *Miss. Valley Barge Line,* 336 U. S. 169 (1949); *International Shoe Co.* v. *Washington,* 326 U. S. 310 (1945); and *West Publishing Co.* v. *McColgan, supra.* The record is without conflict that both corporations engage in substantial income-producing activity in the taxing States. In fact in No. 12 almost half of the corporation's income is derived from the taxing State's sales which are shown to be promoted by vigorous and continuous sales campaigns run through a central office located in the State. While in No. 33 the percent of sales is not available, the course of conduct was largely identical. As was said in *Wisconsin* v. *J. C. Penney Co., supra,* the "controlling question is whether the state has given anything for which it can ask return." Since by "the practical operation of [the] tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred . . ." it "is free to pursue its own fiscal policies, unembarrassed by the Constitution . . . ." *Id.,* at 444.

No. 12—*Affirmed.*
No. 33—*Reversed.*

Mr. Justice Harlan, concurring.

In joining the opinion of the Court, I deem it appropriate to make some further comments as to the issues in these cases because of the strongly held contrary views manifested in the dissenting opinions of Mr. Justice Frankfurter and Mr. Justice Whittaker. I preface what follows by saying that in my view the past decisions of this Court clearly point to, if indeed they do not compel, the sustaining of these two state taxing measures.

Since *U. S. Glue Co.* v. *Town of Oak Creek,* 247 U. S. 321, decided in 1918, this Court has uniformly held that a State, in applying a net income tax of general impact to a corporation doing business within its borders, may reach income derived from interstate commerce to the extent that such income is fairly related to corporate activities within the State. See, *e. g., Shaffer* v. *Carter,* 252 U. S. 37, 57; *Atlantic Coast Line R. Co.* v. *Daughton,* 262 U. S. 413, 416. See also *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 119–120; *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Comm'n,* 266 U. S. 271; *Norfolk & W. R. Co.* v. *North Carolina,* 297 U. S. 682.

As I read the cases the existence of some income from *intrastate* business on the part of the taxed corporation, while sometimes adverted to, has never been considered essential to the valid taxation of such "interstate" income. The cases upholding taxes of this kind cannot, in my opinion, properly be said to rest on the theory that the income earned from the carrying on of interstate commerce was not in fact being taxed, but rather was being utilized simply to measure the income derived from some separate, but unidentified, intrastate commerce, which income was in truth the subject of the tax. That this is so seems to me apparent from *U. S. Glue* itself. There the Court explicitly recognized that the question before it was whether net income from exclusively interstate commerce could be taxed by a State on an apportioned basis together with other income of a corporation. The careful distinction, drawn more than once in the course of the opinion, between gross receipts from interstate commerce, assumed to be immune from state taxation, and net income therefrom, 247 U. S., at 324, 326, 327, 328, 329, would be altogether meaningless if the case is to be explained on the basis suggested by my dissenting brethren, for if all that was in fact being taxed was income from intrastate commerce there is no reason why gross receipts

as well as net income could not have been reached by the State.[1]

Surely any possible doubt on this score is removed by *West Publishing Co.* v. *McColgan*, 328 U. S. 823, where this Court unanimously affirmed, without oral argument, a decision of the California Supreme Court upholding the validity of a statute taxing "income from any activities carried on in this State, regardless of whether carried on in intrastate, interstate or foreign commerce" as applied to reach a portion of the net income of a Minnesota corporation not qualified to do intrastate business in California and assumed by the California court to be deriving income in California *entirely* "from activities in furtherance of a purely interstate business . . . ." 27 Cal. 2d 705, 712, 166 P. 2d 861, 865.

It is suggested that the Court's summary affirmance in the *West* case went on the ground that the taxpayer there was found by the state court to have been engaged in intrastate commerce in California, and that it was only the income earned from such commerce that had in truth been taxed by the State. In my view, this explanation

---

[1] As early as 1919 such a discriminating commentator as the late Thomas Reed Powell had this to say, in commenting on the decisions of this Court in *Peck & Co.* v. *Lowe*, 247 U. S. 165, and *U. S. Glue Co.* v. *Town of Oak Creek, supra:* "We may take it for granted, then, that the legal character of the recipient and the nature of the business in which the recipient is engaged are immaterial elements in considering the constitutionality of a state-wide, all-inclusive general tax on net income from business done within the state. The recipient may be an individual, a partnership, a domestic or a foreign corporation. The business may be exclusively interstate." Indirect Encroachment on Federal Authority by the Taxing Powers of the States. VII, 32 Harv. L. Rev. 634, 639. That nothing in *U. S. Glue* turned on the fact that the taxpayer there happened to be a domestic corporation is shown by the line of cases following it where the taxpayers were foreign corporations doing an interstate business. See cases cited, *ante,* p. 466.

of *West* is unacceptable. Apart from the fact that the California Supreme Court did not proceed on any such basis (see especially the quotation from the state court's opinion set forth at p. 461 of this Court's opinion), the only facts elucidated in support of this view of the *West* case are that employees of the taxpayer solicited business in California, that they were authorized to receive payments on orders taken by them, to collect delinquent accounts, and to adjust complaints, and that they were given space in California lawyers' offices in return for the use of the taxpayer's books there stored, which locations were also advertised as the taxpayer's local offices. It is said that these are "the usual criteria which this Court has consistently held to constitute the doing of intrastate commerce" and that "California determined and taxed only the amount of that intrastate commerce." With deference, this seems to me to be both novel doctrine and unreal analysis; novel doctrine because this Court has never held that activities of this kind, performed solely in aid of interstate sales, are intrastate commerce; unreal analysis, because it is surely stretching things too far to say that California was seeking to measure and tax office renting and complaint adjusting rather than part of the income from concededly interstate sales transactions.

I think that *West* squarely governs the two cases now before us.[2]

---

[2] Apart from the considerations discussed in the text of this opinion, it is noteworthy that the Court in *West*, in relying on *Memphis Natural Gas Co.* v. *Beeler*, 315 U. S. 649, cited directly to page "656" of the *Beeler* opinion where it was said: "In any case, even if taxpayer's business were *wholly interstate commerce* [italics supplied], a nondiscriminatory tax by Tennessee upon the net income of a foreign corporation having a commercial domicile there [citation], or upon net income derived from within the state [citations], is not prohibited by the commerce clause on which the taxpayer alone relies [citing among

It is said that the taxes presently at issue were "laid on income from [interstate commerce] because of its source." If this were so I should of course vote to strike down their application here as unconstitutionally discriminatory against interstate commerce. But this seems to me plainly not such a case. As the opinion of the Court demonstrates, the Minnesota and Georgia taxes are each part of a general scheme of state income taxation, reaching all individual, corporate, and other net income. The taxing statutes are not sought to be applied to portions of the net income of Northwestern and Stockham *because* of the source of that income—interstate commerce—but rather *despite* that source. The thrust of these statutes is not hostile discrimination against interstate commerce, but rather a seeking of some compensation for facilities and benefits afforded by the taxing States to income-producing activities therein, whether those activities be altogether local or in furtherance of interstate commerce. The past decisions of this Court establish that such compensation may be had by the States consistent with the Commerce Clause.

I think it no more a "regulation of," "burden on," or "interference with" interstate commerce to permit a State within whose borders a foreign corporation engages *solely* in activities in aid of that commerce to tax the net income derived therefrom on a properly apportioned basis than to permit the same State to impose a nondiscriminatory net income tax of general application on a corporation engaging in *both* interstate and intrastate commerce therein and to take into account income from both categories. Cf. *Peck & Co.* v. *Lowe,* 247 U. S. 165. In each case the amount of the tax will increase as the profitability of the interstate business done increases. This Court has

other cases *U. S. Glue Co.* v. *Town of Oak Creek, supra*]. There is no contention or showing here that the tax assessed is not upon net earnings justly attributable to Tennessee [citations]."

consistently upheld state net income taxes of general application so applied as to reach that portion of the profits of interstate business enterprises fairly allocable to activities within the State's borders. We do no more today.

Mr. Justice Frankfurter, dissenting.

By way of emphasizing my agreement with my brother Whittaker, I add a few observations.

The Court sustains the taxing power of the States in these two cases essentially on the basis of precedents. For me, the result of today's decisions is to break new ground. I say this because, among all the hundreds of cases dealing with the power of the States to tax commerce, there is not a single decision adjudicating the precise situation now before us. Concretely, we have never decided that a State may tax a corporation when that tax is on income related to the State by virtue of activities within it when such activities are exclusively part of the process of doing interstate commerce. That is the precise situation which the state courts found here, to wit:

> "[Northwestern's] activities in this State were an integral part of its interstate activities, and all revenue received by it from customers in Minnesota resulted from its operations in interstate commerce."

and,

> "[W]ithout dispute [Stockham] was engaged exclusively in interstate commerce in so far as its activities in Georgia are concerned." 213 Ga. 713, 719, 101 S. E. 2d 197, 201.

It is vital to realize that in no case prior to this decision in which the taxing power of a State has been upheld when applied to corporations engaged in interstate commerce, was there a total absence of activities pursued or

advantages conferred within the State severable from the very process which constitutes interstate commerce.

The case that argumentatively comes the closest to the situation now before the Court is *West Publishing Co.* v. *McColgan*, 328 U. S. 823.[1] But in that case too, as the

---

[1] The *West* case was a *per curiam* affirmance without opinion. The Court cited four cases in support: *United States Glue Co.* v. *Town of Oak Creek,* 247 U. S. 321; *Interstate Busses Corp.* v. *Blodgett,* 276 U. S. 245; *Memphis Natural Gas Co.* v. *Beeler,* 315 U. S. 649, 656; *International Shoe Co.* v. *Washington,* 326 U. S. 310. Not one of these cases presented the issue now here; in none had the Court to sustain a state net income tax on a business whose revenue derived solely from interstate commerce.

In *United States Glue Co.* v. *Town of Oak Creek, supra,* this Court upheld an apportioned net income tax levied by the State of Wisconsin on a Wisconsin corporation having its principal office and manufacturing establishment in that State. A substantial part of the corporation's business was intrastate. The only issue before the Court was the power of the State to include interstate income in its apportionment computation.

*Interstate Busses Corp.* v. *Blodgett, supra,* decided that appellant had not sustained the burden of showing that an excise tax of one cent per mile levied by Connecticut on motor vehicles using its highways in interstate commerce fell with discriminating weight on interstate commerce when the tax was viewed as part of the State's entire taxing scheme. Aside from this issue of discrimination, the case was merely another instance of a State charging for the use of its highways.

The Court in *Memphis Natural Gas Co.* v. *Beeler, supra,* upheld a net income tax imposed by the State of Tennessee on revenues earned by the Memphis Gas Company from shipping gas into the State and selling it, together with another company, to retail consumers in that State. The decision was explicitly based on a determination that the revenue was, in fact, derived from intrastate rather than interstate commerce. In addition the Memphis Company was licensed to do business in Tennessee, maintained its principal place of business there, and sold much of its gas in that State. It is true that on the page cited in *Beeler* the opinion indulged in a dictum that net income from interstate commerce was taxable. But this was

opinion of the California Supreme Court which we there summarily sustained clearly set forth, 27 Cal. 2d 705, 166 P. 2d 861, the West Publishing Company did not merely complete in California the business which began in Minnesota. It employed permanent workers who engaged in business activities localized in California, activities which were apart from and in addition to the purely interstate sale of law books. These activities were more than an essential part of the process of interstate commerce; they were, in legal shorthand, local California activities constituting intrastate business. In dealing with those purely local activities the State could properly exert its taxing power in relation to opportunities and advantages which it had given and which it could have withheld by simply not allowing a foreign corporation to do local business, whereas no State may withhold from a foreign corporation within its borders the right to exercise what is part of a process of exclusively interstate commerce. The State gives to a corporation so engaged nothing which it can withhold and therefore nothing for which it can charge a price, whether the price be the cost of a license to do interstate business or a tax on the profits accruing from that business.

---

an almost by-the-way observation, itself relying on citations which do not support it, by a writer prone to uttering dicta.

*International Shoe Co.* v. *Washington, supra,* decided that the Due Process Clause of the Fourteenth Amendment did not prohibit the State of Washington from exercising jurisdiction over the International Shoe Co., in the light of the frequency and extent of the company's business contacts within the State. There was no doubt that the unemployment compensation contributions exacted by Washington were entirely consistent with the Commerce Clause, since Congress had explicitly authorized such levies.

Thus none of the cases cited in *West* support an interpretation of that decision which goes beyond the actual situation of severable local activities presented in that case. Nor do they support the present taxes levied on exclusively interstate business.

I venture to say that every other decision—I say decision, not talk or dicta—on which reliance is placed, presented a situation where conjoined with the interstate commerce was severable local state business on the basis of which the state taxing power became constitutionally operative.  The difference between those situations and this, as a matter of economics, involves the distinction between taking into account the total activity of the enterprise as a going business in determining a fairly apportioned tax based on locally derived revenues, and taxing a portion of revenue concededly produced by exclusively interstate commerce.  To be sure, such a distinction is a nice one, but the last word on the necessity of nice distinctions in this area was said by Mr. Justice Holmes in *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217, 225: "It being once admitted, as of course it must be, that not every law that affects commerce is a regulation of it in a constitutional sense, nice distinctions are to be expected."

Accordingly, today's decision cannot rest on the basis of adjudicated precedents.  This does not bar the making of a new precedent.  The history of the Commerce Clause is the history of judicial evolution.  It is one thing, however, to recognize the taxing power of the States in relation to purely interstate activities and quite another thing to say that that power has already been established by the decisions of this Court.  If new ground is to be broken, the ground must be justified and not treated as though it were old ground.

I do not think we should take this new step.  My objection is the policy that underlies the Commerce Clause, namely, whatever disadvantages may accrue to the separate States from making of the United States a free-trade territory are far outweighed by the advantages not only to the United States as a Nation, but to the component States.  I am assuming, of course, that today's decision

will stimulate, if indeed it does not compel, every State of the Union, which has not already done so, to devise a formula of apportionment to tax the income of enterprises carrying on exclusively interstate commerce. As a result, interstate commerce will be burdened not hypothetically but practically, and we have been admonished again and again that taxation is a practical matter.

I think that interstate commerce will be not merely argumentatively but actively burdened for two reasons:

*First.* It will not, I believe, be gainsaid that there are thousands of relatively small or moderate size corporations doing exclusively interstate business spread over several States. To subject these corporations to a separate income tax in each of these States means that they will have to keep books, make returns, store records, and engage legal counsel, all to meet the divers and variegated tax laws of forty-nine States, with their different times for filing returns, different tax structures, different modes for determining "net income," and different, often conflicting, formulas of apportionment. This will involve large increases in bookkeeping, accounting, and legal paraphernalia to meet these new demands. The cost of such a far-flung scheme for complying with the taxing requirements of the different States may well exceed the burden of the taxes themselves, especially in the case of small companies doing a small volume of business in several States.[2]

*Second.* The extensive litigation in this Court which has challenged formulas of apportionment in the case of railroads and express companies [3]—challenges addressed

---

[2] For a detailed exposition of the manifold difficulties in complying with the diverse and complex taxing systems of the States, see Cohen, State Tax Allocations and Formulas which Affect Management Operating Decisions, 1 Jour. Taxation, No. 2 (July 1954), p. 2.

[3] See, *e. g., Wallace* v. *Hines,* 253 U. S. 67; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Adams Express Co.* v. *Ohio State Auditor,* 165 U. S. 194; *id.,* 166 U. S. 185 (opinion denying rehearing).

to the natural temptation of the States to absorb more than their fair share of interstate revenue—will be multiplied many times when such formulas are applied to the infinitely larger number of other businesses which are engaged in exclusively interstate commerce. The division in this Court on these railroad apportionment cases is a good index of what might reasonably be expected when cases involving the more numerous non-transportation industries come before the Court. This is not a suggestion that the convenience of the Court should determine our construction of the Commerce Clause, although it is important in balancing the considerations relevant to the Commerce Clause against the claims of state power that this Court should be mindful of the kind of questions it will be called upon to adjudicate and its special competence for adjudicating them. Wholly apart from that, the necessity for litigation based on these elusive and essentially non-legal questions casts a burden on businesses, and consequently on interstate commerce itself, which should not be imposed.

These considerations do not at all lead to the conclusion that the vast amount of business carried on throughout all the States as part of what is exclusively interstate commerce should not be made to contribute to the cost of maintaining state governments which, as a practical matter, necessarily contribute to the conduct of that commerce by the mere fact of their existence as governments. The question is not whether a fair share of the profits derived from the carrying on of exclusively interstate commerce should contribute to the cost of the state governments. The question is whether the answer to this problem rests with this Court or with Congress.

I am not unmindful of the extent to which federal taxes absorb the taxable resources of the Nation, while at the same time the fiscal demands of the States are on the increase. These conditions present far-reaching prob-

lems of accommodating federal-state fiscal policy. But a determination of who is to get how much out of the common fund can hardly be made wisely and smoothly through the adjudicatory process. In fact, relying on the courts to solve these problems only aggravates the difficulties and retards proper legislative solution.

At best, this Court can only act negatively; it can determine whether a specific state tax is imposed in violation of the Commerce Clause. Such decisions must necessarily depend on the application of rough and ready legal concepts. We cannot make a detailed inquiry into the incidence of diverse economic burdens in order to determine the extent to which such burdens conflict with the necessities of national economic life. Neither can we devise appropriate standards for dividing up national revenue on the basis of more or less abstract principles of constitutional law, which cannot be responsive to the subtleties of the interrelated economies of Nation and State.

The problem calls for solution by devising a congressional policy. Congress alone can provide for a full and thorough canvassing of the multitudinous and intricate factors which compose the problem of the taxing freedom of the States and the needed limits on such state taxing power.[4]   Congressional committees can make

---

[4] See *Northwest Airlines, Inc.,* v. *Minnesota,* 322 U. S. 292. In *Northwest* we pointed to the desirability of congressional action to formulate uniform standards for state taxation of the rapidly expanding airline industry. Following our decision Congress directed the Civil Aeronautics Board to study and report to Congress methods of eliminating burdensome, multiple state taxation of airlines. See H. R. Doc. No. 141, 79th Cong., 1st Sess. This report of the Board was a 158-page document whose length and complex economic content in dealing with only a single subject of state taxation, illustrate the difficulties and nonjudicial nature of the problem. Following the presentation of this extensive report, several bills were introduced into Congress providing for a single uniform apportionment formula

studies and give the claims of the individual States adequate hearing before the ultimate legislative formulation of policy is made by the representatives of all the States. The solution to these problems ought not to rest on the self-serving determination of the States of what they are entitled to out of the Nation's resources.  Congress alone can formulate policies founded upon economic realities, perhaps to be applied to the myriad situation involved by a properly constituted and duly informed administrative agency.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE FRANKFURTER and MR. JUSTICE STEWART join, dissenting.

I respectfully dissent.  My disagreement with the Court is over what I think are constitutional fundamentals.  I think that the Commerce Clause of the Constitution, Art. I, § 8, cl. 3, as consistently interpreted by this Court until today, precludes the States from laying taxes directly on, and thereby regulating, "exclusively interstate commerce."  But the Court's decision today holds that the States may do so.

The statutes, facts and findings involved are clear, sharp and undisputed.  There is no room to doubt that the statutes involved were designed to tax income derived "exclusively [from] interstate commerce"; that the courts of the States concerned have found that the income involved derived "exclusively [from] interstate com-

---

to be used by the States in taxing airlines. H. R. 1241, 80th Cong., 1st Sess.; S. 2453, 80th Cong., 2d. Sess.; S. 420, 81st Cong., 1st Sess. None of these bills was enacted.

Australia has resolved the problem of conflicting and burdensome state taxation of commerce by a national arrangement whereby taxes are collected by the Commonwealth and from these revenues appropriate allocations are made annually to the States through the mechanism of a Premiers' Conference—the Prime Minister of the Commonwealth and the Premiers of the several States.

merce"; and that the taxes in question were laid directly on that interstate commerce.

Northwestern States Portland Cement Company, an Iowa corporation maintaining its principal office and only manufacturing plant in Mason City in that State, has for many years sold its cement locally in Iowa and, in interstate commerce, to dealers in neighboring States including Minnesota. Although the "exclusively" interstate character of the commerce done by Northwestern in Minnesota is not disputed, the course of its conduct in that State is summarized in the margin.[1] In 1950 Minne-

---

[1] Northwestern did not qualify, under Minnesota laws, to do business in that State. During the years involved it maintained a small sales office in Minneapolis where it employed two salesmen and a secretary. Her duties were wholly clerical. It also employed from two to three salesmen at other points in Minnesota who worked out of their homes. Apart from a small amount of furniture in its Minneapolis office and two salesmen's automobiles, it owned no property within the State, nor did it have a bank account therein, and all salaries and reimbursable expenses of the salesmen and the secretary, office rent, telephone bills and all other expenses of the Minneapolis office, were paid directly from the home office. The salesmen solicited and took orders from dealers but they were not authorized to accept orders or make contracts for the company, nor were they authorized to receive payments, collect accounts or adjust claims. Orders which they received were mailed to the home office for approval of credit and for acceptance or rejection. The orders were acknowledged and accepted or rejected in writing, mailed from the home office directly to the purchasers. Accepted orders were filled by delivery of the cement to a rail carrier, f. o. b. plant at Mason City, and consigned to the purchasers. Sales invoices were prepared in and mailed from the home office directly to the purchasers who made payment directly to the company at its home office. The salesmen also called on contractors and other users of cement, not to solicit orders, but for the purpose of acquainting them with the merits of Northwestern's product and of advising them of the names of the local dealers where it might be purchased. There was evidence which might have supported a finding that these salesmen sometimes, in effect, took orders from contractors for, and delivered them to,

sota, acting under its statutory "three factor formula" now contained in Minnesota Statutes, 1957, § 290.19,[2] apportioned and allocated to Minnesota a substantial part of Northwestern's net income for each of the years 1933 through 1948. Upon the amount of net income so allocated, Minnesota assessed a tax against Northwestern for each of those years under what is now Minnesota Statutes, 1957, § 290.03, which, in pertinent part, provides:

> "290.03 . . . Classes of taxpayers. An annual tax for each taxable year, computed in the manner and at the rates hereinafter provided, is hereby imposed upon the taxable net income for such year of the following classes of taxpayers:
>
> "(1) Domestic and foreign corporations . . . whose business within this state during the taxable year consists exclusively of . . . interstate commerce . . . ."

Upon Northwestern's refusal to pay those taxes, Minnesota brought this action in its own court to recover them. Northwestern defended upon the grounds (1) that

---

local dealers who stocked Northwestern's cement, and thus were engaged in the local business of selling cement for such dealers, *Cheney Brothers Co.* v. *Massachusetts,* 246 U. S. 147, 155. But no such finding was made, and there is more than colorable basis for believing that Minnesota did not press for such a finding, as any such practice could easily be ended by Northwestern and Minnesota's evident object was not to rest on such a basis, but to obtain an adjudication that its statute, § 290.03, validly imposed a tax upon Northwestern's net income from Minnesota customers though derived "exclusively [from] interstate commerce."

[2] Minnesota Statutes, 1957, § 290.19, provides, in substance, that where business is done "partly within and partly without this state" there shall be apportioned and allocated to Minnesota, as income derived from the intrastate commerce done in that State, an amount equal to the ratio which the taxpayer's (a) sales made within that State, (b) tangible property owned or used in that State, and (c) total payrolls paid in that State bear to the taxpayer's totals of those factors.

§ 290.03, as applied, imposed the taxes directly upon interstate commerce and, hence, regulated it in violation of the Commerce Clause of the Constitution, Art. I, § 8, cl. 3, and (2) that the income involved was not subject to Minnesota's jurisdiction and its action in taxing it violated the Due Process Clause of the Fourteenth Amendment. At the conclusion of the trial, the court made formal findings of fact including the following:

> "[Northwestern's] activities in this state were an integral part of its interstate activities, and all revenue received by it from customers in Minnesota resulted from its operations in interstate commerce."

But the trial court, nevertheless, sustained the tax and entered judgment for the State. Northwestern appealed to the Supreme Court of Minnesota which, without challenging the finding of fact above-quoted, affirmed, 250 Minn. 32, 84 N. W. 2d 373, and the case is here on Northwestern's appeal. 355 U. S. 911.

Stockham Valves & Fittings, Inc., is a Delaware corporation maintaining its principal office and only manufacturing plant in Birmingham, Alabama. It makes valves and pipefittings which it sells locally in Alabama and, in interstate commerce, to wholesalers and jobbers in Georgia as well as in all other States of the Union. Although the facts are stipulated and the "exclusively" interstate character of the commerce done by Stockham in Georgia is not in dispute, the course of its conduct in that State is summarized in the margin.[3] Petitioner, as

---

[3] To facilitate the conduct of its commerce, Stockham keeps a stock of its products in public warehouses in Birmingham, Chicago, Houston and Vernon (California), and maintains in each of those cities, and in each of 8 other widely separated industrial centers, including Atlanta, a small sales office. It has not qualified, under Georgia laws, to do business in that State. Its Atlanta office, which is listed in the Atlanta telephone and city directories, is staffed with

State Revenue Commissioner of Georgia, acting under the "Three Factor Ratio" of the Code of Georgia, 1933, as amended, § 92–3113 (4),[4] apportioned and allocated to Georgia a part of Stockham's net income for each of the years 1952, 1954, and 1955. Upon the amounts of net income so allocated, petitioner assessed a tax against Stockham for each of those years under the Code of

one salesman and a secretary. Her duties are entirely clerical. The salesman spends about one-third of his working time in Georgia, and the remainder in four other southeastern States, calling on persons who are in position to recommend or specify the use of particular building supplies in construction work, such as architects, engineers and contractors, and on independent wholesalers and jobbers, endeavoring to impress them with the merits of, and to induce them to specify or recommend the use of, Stockham's products. Although he has no authority to accept orders or to make contracts for the company, he solicits orders from wholesalers and jobbers, and transmits such as he receives to the home office for approval of credit and acceptance or rejection, but "for the most part" orders are mailed directly by the purchasers to the home office in Birmingham. Accepted orders are filled by delivery of the goods to the purchasers, or to a common carrier consigned to the purchasers, at the Birmingham plant. Sales invoices are prepared and mailed by the home office directly to the purchasers who remit to the home office. The salesman does not receive payments, collect accounts or adjust claims. Except for the small amount of office furniture in its Atlanta sales office the company has no property in Georgia, nor does it have a bank account there, and the salaries of the salesman and secretary and their reimbursable expenses, the office rent, telephone bills and all other expenses of the Atlanta office are paid directly from the home office.

[4] Code of Georgia, 1933, as amended, § 92–3113 (4) provides that "Where income is derived from the manufacture, production, or sale of tangible personal property, the portion of the net income therefrom attributable to property owned or business done within this State shall be taken to be the portion arrived at by" the arithmetical average which the ratios of the taxpayer's (a) inventories of products held in the State, (b) compensation paid or incurred in the State, and (c) gross receipts from business done within the State bear to the taxpayer's totals of those factors.

Georgia of 1933, as amended, § 92–3113, which, in pertinent part, provides:

"Corporations, allocation and apportionment of income.—The tax imposed by this law shall apply to the entire net income, as herein defined, received by every corporation, foreign or domestic, owning property or doing business in this State. Every such corporation shall be deemed to be doing business within this State if it engages within this State in any activities or transactions for the purpose of financial profit or gain, . . . *whether or not any such activity or transaction is connected with interstate or foreign commerce.*" (Emphasis added.)

Upon demand, Stockham paid the taxes and, after denial of timely claim for refund, brought this suit to recover the amount paid, contending (1) that § 92–3113, as applied, imposed the taxes directly upon interstate commerce and, hence, regulated it in violation of the Commerce Clause of the Constitution, and (2) that the income involved was not subject to Georgia's jurisdiction and its action in taxing it violated the Due Process Clause of the Fourteenth Amendment. The trial court sustained the tax. Stockham appealed to the Supreme Court of Georgia. It found that:

"[W]ithout dispute [Stockham] was engaged exclusively in interstate commerce in so far as its activities in Georgia are concerned . . . ." 213 Ga. 713, 719, 101 S. E. 2d 197, 201.

And it held that § 92–3113, as applied, violated the Commerce Clause of the Constitution. It thereupon reversed the judgment, 213 Ga. 713, 101 S. E. 2d 197, and we granted Georgia's petition for certiorari. 356 U. S. 911.

I submit that these simple recitals clearly show (1) that the Minnesota and Georgia statutes, in plain terms, purport to tax income derived "exclusively [from]

interstate commerce," (2) that the Minnesota and Georgia courts have found that the income involved was derived "exclusively [from] interstate commerce," and (3) that the taxes were laid directly on that interstate commerce. There is no room to dispute these admitted facts. Yet, I believe, the Court does not squarely face them but veiledly treats the cases as though intrastate commerce were to some extent involved. It says, referring to the Minnesota case, (a) that one of the salesmen was known as "district manager," (b) that the Minneapolis sales office was used "as a clearing house," (c) that "Orders were solicited and received from [builders, contractors and architects], on special forms furnished by appellant, directed to an approved local dealer who in turn would fill them by placing a like order with appellant, [and that] [t]hrough this system appellant's salesmen would in effect secure orders for local dealers which in turn were filled by appellant in the usual manner," and (d) that "Salesmen would also receive and transmit claims against appellant for loss or damage in any shipments made by it, informing the company of the nature thereof and requesting instructions concerning the same." These recitals, if found true, might very well have supported a finding, had there been one, that the taxpayer was engaged in intrastate commerce in Minnesota. Particularly might the statement about the salesmen taking orders from builders, contractors and architects for local dealers have done so, for it was expressly held in *Cheney Brothers Co.* v. *Massachusetts*, 246 U. S. 147, 155, that such conduct amounted to engaging in the local business of selling products for such dealers. But no such finding was made by the Minnesota courts. And there is more than colorable basis for believing that Minnesota did not desire such a finding, as any such practice could easily be ended by Northwestern, and Minnesota's purpose was not to rest on such a basis but to obtain an adjudication that

its statute, § 290.03, constitutionally imposed a tax upon the taxpayer's net income from Minnesota customers though derived "exclusively [from] interstate commerce." Nor can the Court's seeming disdain of the word "commerce" and its frequent use, instead, of "activities" obscure the fact that it was "exclusively interstate commerce" that was taxed. The abstract use of the word "activities," as applied to a commerce question and distinguished from a due process one, has no legal significance. What is of legal consequence is whether the "activities" were in intrastate or in interstate commerce. Here, the Minnesota and Georgia courts have found that the income which was taxed had derived "exclusively [from] interstate commerce."

So if anything is plain it is that we are not presented with cases involving the doing of *any* intrastate commerce in Minnesota or Georgia by the taxpayers. The courts of those States have expressly found that there was none. Therefore, we do not have a situation where a taxpayer was doing *both* intrastate and interstate commerce within the taxing State, thus to invoke application of the State's apportionment statute in order to determine how much of the total income of the taxpayer had derived from intrastate commerce in the taxing State, and was, therefore, subject to its taxing power. Instead we have here *only* interstate commerce, which the States are prohibited from regulating, by direct taxation or otherwise, by the Commerce Clause of the Constitution.

Yet, the Court "conclude[s] that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local *activities* within the taxing State forming sufficient nexus to support the same." (Emphasis added.) I respectfully submit that this is novel doctrine, and that this Court has never before so held.

The Court refers to our past opinions in this field as creating a "quagmire," and says "there is a 'need for clearing up the tangled underbrush of past cases' with reference to the taxing power of the States . . . ." I respectfully submit that this Court's past opinions, rightly understood and aligned in their proper categories, are remarkably consistent in a field so varied and complex, and that they do not deserve the characterizations given them. It is quite true in this field—as I think is the case in almost every field—that loose statements can be found in some of the opinions which when considered in isolation, and certainly when taken out of context, are seemingly outside the line of the law. But I think it is entirely fair to say that such confusion as exists is mainly due to a failure properly to analyze, understand, categorize and apply the decisions.

In applying the Court's opinions in the field of state income taxation of commerce, it is at least necessary sharply to discern (1) whether the tax was laid upon the general income of a resident or domiciliary of the taxing State, (2) whether the taxpayer's production, manufacturing, distribution or management facilities, or some of them, were located in the taxing State, (3) whether the taxpayer conducted *both* intrastate and interstate commerce in the taxing State, and, if so, (4) whether the tax was directly laid on income derived from interstate commerce, or—what is the equivalent—on the whole of the income, or whether the whole of the income was used as one of the several factors in an apportionment formula merely for the purpose of fairly measuring the uncertain percentage or proportion of the total income that was earned within the taxing State.

Let us start our consideration with fundamentals. Of course, the foundation is the Commerce Clause itself. It provides: "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the sev-

486

eral States, and with the Indian Tribes . . . ." U. S. Const., Art. I, § 8, cl. 3. That clause "by its own force created an area of trade free from interference by the States." *Freeman* v. *Hewit*, 329 U. S. 249, 252. "[N]o State has the right to lay a tax on interstate commerce in any form. . . . [T]he reason is that such taxation is a burden on that commerce, and amounts to a regulation of it, which belongs solely to Congress." *Leloup* v. *Port of Mobile*, 127 U. S. 640, 648. And see the thirteen cases in this Court there cited in support of the quoted text. Mr. Justice Brandeis, speaking for the Court in *Sprout* v. *South Bend*, 277 U. S. 163, 171, declared that "in order that [a State] fee or tax shall be valid, it must appear that it is imposed *solely* on account of the intrastate business; that the amount exacted is not increased because of the interstate business done; *that one engaged exclusively in interstate commerce would not be subject to the imposition;* and that the person taxed could discontinue the intrastate business without withdrawing also from the interstate business." (Emphasis added.) The same declaration was made for the Court by Mr. Justice Butler in *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, 470, and again by Mr. Chief Justice Hughes in *Cooney* v. *Mountain States Tel. Co.,* 294 U. S. 384, 393.

From this alone it would seem necessarily to follow that the taxes here challenged, which were laid by the States directly on "exclusively interstate commerce," burdened that commerce and, hence, regulated it in violation of the Commerce Clause of the Constitution. But there is more. This Court has consistently struck down state taxes which were laid on business that was *exclusively* interstate in character. *Cheney Brothers Co.* v. *Massachusetts,* 246 U. S. 147, 153; *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203; *Ozark Pipe Line Corp.* v. *Monier,* 266 U. S. 555; *Spector Motor Service* v. *O'Connor,* 340 U. S. 602. Cf. *Joseph* v. *Carter & Weekes Co.,* 330

U. S. 422; *Freeman* v. *Hewit, supra.* Neither the Court nor counsel have cited, and our research has not disclosed, a single opinion by this Court that has upheld a state tax laid on "exclusively interstate commerce," and we are confident none exists.

The Court recognizes that "the States, under the Commerce Clause, are not allowed 'one single-tax-worth of direct interference with the free flow of commerce.' *Freeman* v. *Hewit,* 329 U. S. 249, 256." It then says "On the other hand, it has been established since 1918 that a net income tax on revenues derived from interstate commerce does not offend constitutional limitations upon state interference with such commerce. The decision of *Peck & Co.* v. *Lowe,* 247 U. S. 165, pointed the way." What way did it point? There the 1913 *federal* income tax Act, imposing a tax upon the "entire net income arising or accruing from all sources during the preceding calendar year," was applied by the Federal Government to the whole net income of one who derived about three-fifths of it from "buying goods in the several States, shipping them to foreign countries and there selling them." The question was whether such a tax validly could be imposed in the light of Art. I, § 9, cl. 5 of the Constitution which provides that "No Tax or Duty shall be laid on Articles exported from any State." This Court held that the export clause only precluded taxation of "articles in course of exportation," and did not prohibit federal taxation of general income of the taxpayer "from all sources," and that the tax was "not laid on income from exportation because of its source," but upon general income "from all sources," and was, therefore, within the *federal* power to levy. 247 U. S., at 174. But here the States of Minnesota and Georgia "laid [the taxes directly] on income from [exclusively interstate commerce] because of its source." They do not contend that they were laid on *any* intrastate commerce but admit

there was none. I submit that the *Lowe* case does not in any sense "point the way" for direct taxation by a State of that which it finds and admits to be "exclusively interstate commerce."

The Court then says "The first case in this Court applying the doctrine [of the *Lowe* case] to interstate commerce was that of *U. S. Glue Co.* v. *Town of Oak Creek,* 247 U. S. 321." I submit that nothing in that case is authority for the proposition that a State may tax "exclusively interstate commerce." Exactly to the contrary, it sustained a tax only on "that proportion of [the taxpayer's] income derived from business transacted . . . within the State . . . ." 247 U. S., at 329. That was the whole point of the case. There the Glue Company, a Wisconsin corporation, maintained its principal office and its only manufacturing plant in the town of Oak Creek, in that State. It also maintained stocks in branches in other States. It sold its products both locally in Wisconsin, and in other States in interstate commerce, shipping either directly from its plant in Wisconsin or from one of its branches in another State. In the year involved, about one-seventh of its sales were made locally in Wisconsin, four-sevenths of them were made, and the goods shipped from its factory directly to customers in other States, in interstate commerce, and two-sevenths of them were made from stocks in its branches in other States. Wisconsin's income tax statutes provided, in pertinent part, that "any person engaged in business within and without the state shall . . . be taxed only upon that proportion of such income as is derived from business transacted . . . within the state." *"In order to determine what part of the income of a corporation engaged in business within and without the State . . . is to be taxed as derived from business transacted . . . within the State, reference is had to a formula prescribed by another statute,"* which employed the total income of the tax-

payer as one of its several factors. "This formula was applied in apportioning [the taxpayer's] net 'business income' for the year" involved, which produced an amount substantially exceeding one-seventh of its total income—the amount of its local sales. "[U]pon the portion thus attributed to the State . . . the tax in question was levied." 247 U. S., at 323–325. The Glue Company resisted the tax, contending that it was imposed directly upon interstate commerce in violation of the Commerce Clause of the Constitution, and, failing of relief in the Supreme Court of the State, it brought the case here on writ of error. This Court affirmed, concluding that the tax was "measured . . . by the net proceeds from this part of plaintiff's business, along with a like imposition upon its income derived from other sources, and in the same way that other corporations *doing business within the State* are taxed *upon that proportion of their income derived from business transacted . . . within the State . . . .*" 247 U. S., at 329. (Emphasis added.)

It would seem too obvious for debate that if a taxpayer maintains its factory and produces all its goods in one State but sells the whole in other States in interstate commerce, it has derived some portion of its income in the State of manufacture or production. It should be obvious, too, that where such a manufacturer has sold some of its products locally and others of them in interstate commerce, that the mere ratio of intrastate sales to interstate ones well might not constitute a fair basis for determining what part of the net income was derived from intrastate commerce on the one hand, and interstate commerce on the other. Inasmuch as it has always been thought by American lawyers that the States cannot tax interstate commerce but may tax intrastate commerce, it has been deemed necessary for the State to determine what portion of the total income of the taxpayer was derived from intrastate commerce done within its borders

and is therefore subject to its taxing power. To accomplish that purpose, most States, like Wisconsin in the *U. S. Glue* case, and like Minnesota and Georgia in the cases here, have adopted apportionment statutes, applicable to situations where the taxpayer is doing business *both* within and without the State, which use, as one of the several factors, the total income of the taxpayer in *measuring* the part of the income that was derived from within the taxing State. Those were the principles applied in the *U. S. Glue* case.

Those principles were again made unmistakably clear, and were applied, by Mr. Justice Brandeis, in *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, next relied on by the Court. That case does not hold that "exclusively interstate commerce" may be taxed by a State. It holds just the contrary. There Underwood Typewriter Company, though a Delaware corporation, had become a domiciliary of Connecticut and manufactured all of its machines at its factory in that State. It sold them both locally in Connecticut and in other States in interstate commerce. In the year involved, about 33 percent of its dollar volume of sales was made in Connecticut and the remainder in other States in interstate commerce. To determine the amount of Underwood's net income derived from intrastate commerce, Connecticut applied the formula prescribed by its apportionment statute. This resulted in a determination that 47 percent of Underwood's net income had been derived from intrastate commerce in Connecticut. Upon that amount it computed and assessed its 2 percent net income tax. This Court, in sustaining the tax, over Underwood's objection that it violated the Commerce Clause of the Constitution, said: *"This tax is based upon the net profits earned within the State.* That a tax *measured* by net profits is valid, although these profits may have been derived in part, or

indeed mainly, from interstate commerce is settled. *U. S. Glue Co.* v. *Oak Creek,* 247 U. S. 321; *Shaffer* v. *Carter,* 252 U. S. 37, 57. Compare *Peck & Co.* v. *Lowe,* 247 U. S. 165. . . . The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other States. In this it was typical of a large part of the manufacturing business conducted in the State. The legislature in attempting to put upon this business its fair share of the burden of taxation was faced with the *impossibility of allocating specifically* the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment *which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the State."* 254 U. S., at 120–121. (Emphasis added.)

The Court next takes up the case of *Memphis Natural Gas Co.* v. *Beeler,* 315 U. S. 649. That case does not at all hold that "exclusively interstate commerce" may be taxed by a State. It, too, holds just the contrary. There Memphis Natural Gas Company purchased gas in Louisiana which it transported through its interstate pipe line to Tennessee where it sold 20 percent of it in interstate commerce, but it delivered 80 percent of it to Memphis Power & Light Company. "That company distributes it to consumers under a contract with taxpayer which the Supreme Court of Tennessee has found to be a joint undertaking of the two companies whereby taxpayer furnishes gas from its pipeline, the Memphis company furnishes facilities and service for distribution and sale to consumers, and the proceeds of the sale, after deduction of specified costs and expenses, are divided between the two companies." 315 U. S., at 652. A Tennessee statute imposed a tax on all foreign and domestic corporations of "three per cent. of the net earnings . . . arising

from business done *wholly within the state, excluding earnings arising from interstate commerce." Ibid.* Acting under that statute, a tax "was laid on [the taxpayer's] net earnings from the distribution of gas *under its contract* with the Memphis company." 315 U. S., at 653. This Court said that "if the Supreme Court of Tennessee correctly construed taxpayer's contract with the Memphis company as establishing a profit-sharing joint adventure in the distribution of gas to Tennessee consumers, the taxpayer's net earnings *under the contract* were subject to local taxation." 315 U. S., at 653–654. (Emphasis added.) This Court then found that the Supreme Court of Tennessee had correctly construed the contract and that the taxpayer's activities "constituted participation in the business of distributing the gas to consumers after its delivery into the service pipes of the Memphis company," and sustained the tax, concluding: "There is no contention or showing here that the tax assessed is not *upon net earnings justly attributable to Tennessee."* 315 U. S., at 656, 657. (Emphasis added.)

It is true that Mr. Chief Justice Stone's opinion in the *Beeler* case contains the following language at page 656:

"In any case, even if taxpayer's business were wholly interstate commerce, a nondiscriminatory tax by Tennessee upon the net income of a foreign corporation *having a commercial domicile there,* cf. *Wheeling Steel Corp.* v. *Fox,* [298 U. S. 193], or upon net income derived from within the state, *Shaffer* v. *Carter,* 252 U. S. 37, 57; *Wisconsin* v. *Minnesota Mining Co.,* 311 U. S. 452; cf. *New York ex rel. Cohn* v. *Graves,* 300 U. S. 308, is not prohibited by the commerce clause on which alone taxpayer relies. *U. S. Glue Co.* v. *Oak Creek,* 247 U. S. 321; *Underwood Typewriter Co.* v. *Chamberlain,* 245 U. S. 113, 119–20 . . . ." (Emphasis added.)

The first sentence of that quotation caused Mr. Justice Burton to say, in *Spector Motor Service* v. *O'Connor,* 340 U. S. 602, 609, note 6, that the statement was "not essential to the decision in the case." But it is a mistake to say that Mr. Chief Justice Stone's language even comes near holding that exclusively interstate commerce may be taxed by a State. Note that he spoke of a foreign corporation "having a commercial domicile" in the taxing State. That connotes the conduct of intrastate commerce in the taxing State, such as was involved in the *Fox* case which he cited, *i. e.,* the maintenance in the taxing State of the taxpayer's "principal office" in which its principal officers were located and conducted their business, and where a duplicate stock ledger and the records of capital stock transactions of the taxpayer were continuously kept. Of course that conduct amounted to the doing of intrastate commerce, and naturally the State could tax that intrastate commerce. And that's all the State did in *Fox.* Interstate commerce was not taxed either in *Beeler* or in *Fox.*

The Court then cites *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Commission,* 266 U. S. 271, and *Norfolk & W. R. Co.* v. *North Carolina,* 297 U. S. 682. But from the Court's own recitals respecting those cases it appears that the taxpayers there "carried on substantial local activities" within the taxing States, which permitted the States to lay taxes on that intrastate commerce, "measured on a proportional formula." Those cases are exactly in line with the *U. S. Glue, Underwood,* and *Beeler* cases. They did not sustain a state tax on exclusively interstate commerce.

The Court next cites this Court's *per curiam* in *West Publishing Co.* v. *McColgan,* 328 U. S. 823, and quotes from the California opinion, which was there affirmed, only the following: "The employees were given space in the offices of attorneys in return for the use of plaintiff's

books stored in such offices." It will be seen by reference to the California opinion that the California court had found considerably more intrastate commerce. It had found that the taxpayer "regularly employed solicitors in [that] state who . . . were authorized to receive payments on orders taken by them, to collect delinquent accounts, and to make adjustments in case of complaints by customers, [and who] were given space in the offices of attorneys in return for the use of [the taxpayer's] books stored in such offices [which were] advertised as its local offices . . . ." 27 Cal. 2d 705, 707, 166 P. 2d 861, 862. That finding established the usual criteria which this Court has consistently held to constitute the doing of intrastate commerce. California determined and taxed only the amount of that intrastate commerce. It did not tax any interstate commerce. This Court in its *per curiam* affirmance cited the landmark Commerce Clause cases of *U. S. Glue Co.* v. *Oak Creek, supra; Memphis Natural Gas Co.* v. *Beeler, supra,* and the landmark Due Process Clause case of *International Shoe Co.* v. *Washington,* 326 U. S. 310. Surely this makes it clear that at least this Court did not sustain any tax on interstate commerce.

The Court's quotation from *Wisconsin* v. *Minnesota Mining & Manufacturing Co.,* 311 U. S. 452, shows on its face that Wisconsin there taxed only income "attributable to earnings within the taxing state . . . ."

*Spector Motor Service* v. *O'Connor,* 340 U. S. 602, is quite consistent with the prior cases. There, by a process of elimination, the Court determined what the tax was *not* in arriving at what it was, and concluded that it was a tax which attached "solely to the franchise of petitioner to do interstate business." The Court then said:

> "This Court heretofore has struck down, under the Commerce Clause, state taxes upon the privilege of carrying on a business that was *exclusively* interstate in character. The constitutional infirmity of such a

tax persists no matter how fairly it is apportioned to business done within the state." (Citing *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203; *Ozark Pipe Line Corp.* v. *Monier,* 266 U. S. 555; and referring, for comparison, to *Interstate Pipe Line Co.* v. *Stone,* 337 U. S. 662, 669; *Joseph* v. *Carter & Weekes Co.,* 330 U. S. 422; *Freeman* v. *Hewit,* 329 U. S. 249.)

"Our conclusion is not in conflict with the principle that, where a taxpayer is engaged both in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer's business done within the state . . . ." 340 U. S., at 609–610.

Is it not plain that this recent case holds that "exclusively" interstate commerce may not be taxed by a State?

With this demonstration of the holdings in the commerce cases relied upon by the Court, surely we can repeat, with the conviction of demonstrated truth, our statement that none of the cases relied on by the Court supports its holding "that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State . . . ." The fact that such taxes may be fairly or "properly apportioned" is without legal consequence, for "The constitutional infirmity of such a tax persists no matter how fairly it is apportioned to business done within the state." *Spector Motor Service* v. *O'Connor, supra,* at 609. That this Court has always sustained state taxes on fairly determined amounts of intrastate income should be evident enough from the shown fact that it has struck them down only when there was none.

The Court says "We believe that the rationale of these cases, involving income levies by States, controls the issues here." I agree that the rationale of those cases controls the issues here. But I cannot agree that those cases involved *like* "income levies by States." They involved levies of income taxes on intrastate commerce, not on "exclusively interstate commerce." Whereas, here both the Minnesota and Georgia courts have found that the income taxed by those States had derived "exclusively [from] interstate commerce," and that the tax was not levied upon any intrastate commerce for there was none.

In these circumstances, I submit it is idle to say that the taxes were not laid "on" interstate commerce, but on the taxpayer's general income after all commerce had ended, and, therefore, did not burden, nor hence regulate, interstate commerce. For in addition to the plainness of the fact, the courts of Minnesota and Georgia have explicitly held in these cases that the income involved was derived "exclusively [from] interstate commerce," and that the taxes were laid on that income. The taxes do not purport to have been, and could not have been, laid on any income derived from intrastate commerce in those States for there was none. It necessarily follows that the taxes were "laid on income from [interstate commerce] because of its source," *Peck & Co.* v. *Lowe, supra,* at 174, just as in *Spector Motor Service* v. *O'Connor, supra.*

The Commerce Clause denies state power to regulate interstate commerce. It vests that power exclusively in Congress. Direct taxation of "exclusively interstate commerce" is a substantial regulation of it and, therefore, in the absence of congressional consent, the States may not directly tax it. This Court has so held every time the question has been presented here until today. Without congressional consent, the States of Minnesota and Georgia have laid taxes directly on what they admit was

"exclusively interstate commerce." Hence, in my view, those levies plainly violated the Commerce Clause of the Constitution and cannot stand consistently therewith and with our prior cases. I would, therefore, reverse the judgment of the Supreme Court of Minnesota in No. 12 and affirm the judgment of the Supreme Court of Georgia in No. 33.