**HOWARD COTTON COMPANY,
Plaintiff-Appellee,**

**v.**

**Martha B. OLSEN, Commissioner of
Revenue, State of Tennessee,
Defendant-Appellant.**

Supreme Court of Tennessee,
at Jackson.

July 16, 1984.

Leland M. McNabb, John McQuiston II, Memphis, for plaintiff-appellee; Goodman, Glazer, Greener, Schneider & McQuiston, Memphis, of counsel.

Joe C. Peel, Asst. Atty. Gen., Nashville, for defendant-appellant; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

OPINION

BROCK, Justice.

A.

The plaintiff, Howard Cotton Company, paid under protest for the taxable years 1975 through 1979 the Tennessee Excise Tax on corporate net earnings as assessed by the Commissioner of Revenue under T.C.A., § 67–2701, *et seq.* (now, T.C.A., § 67–4–801, *et seq.*). For the years in question the plaintiff paid the tax on 36% of its net earnings, conceiving that it was, under the Tennessee apportionment statutes, not liable for the tax on the remainder of its net earnings. The Commissioner, however, later determined that the plaintiff was not entitled to thus apportion its net earnings and, accordingly, made an additional assessment of $463,978.23 in taxes, interest and penalty for the tax years 1975 through 1979 which the plaintiff paid under protest and for which it sues in this action.

Whether or not plaintiff was entitled to apportion its net earnings for the taxable years 1975 and 1976 is controlled by former T.C.A., § 67–2706 (1955), which provided:

"In the case of corporations, cooperatives, joint stock associations and business trusts doing business in Tennessee and elsewhere the net earnings shall be apportioned as hereinafter set forth and the net earnings thus apportioned to Tennessee shall be deemed to be the earn-

ings arising from business done within the state and shall be the measure of this tax ...."

That statute, prior to its repeal in 1976, acquired considerable judicial gloss consisting of decisions of this Court in *Navarre Corporation v. Tidwell,* Tenn., 524 S.W.2d 647 (1975); *Tidwell v. Gaines Manufacturing Company,* Tenn., 526 S.W.2d 460 (1975); *H.D. Lessors, Inc. v. Tidwell,* Tenn., 544 S.W.2d 611 (1976); *Signal Thread Company v. King,* 222 Tenn. 241, 435 S.W.2d 468 (1968); *R.J. Reynolds Tobacco Co. v. Carson,* 187 Tenn. 157, 213 S.W.2d 45 (1948). In the *Navarre* case this Court stated:

"Generally, where a Tennessee corporation seeks to claim the benefit of the apportionment formula, it has been required to show a substantial number of contacts with another jurisdiction in order to bring itself within the concept of 'doing business' in that jurisdiction. Actual domestication or qualification to do business in another jurisdiction is one of the criteria which has been emphasized; the payment of franchise or excise taxes, or taxes substantially equivalent in nature, to another jurisdiction has also been a major consideration.... These are not necessarily the sole criteria for permitting apportionment, but certainly, under the Tennessee cases, a very strong showing would have to be made by a taxpayer which had neither qualified to do business in another jurisdiction nor paid privilege taxes there on the privilege of doing business." 524 S.W.2d at 650.

Our decision in the *Gaines Manufacturing Company* case made clear, however, that a company which had not domesticated its charter in other states nor paid excise or franchise taxes in other states might, nevertheless, establish its right to apportionment by showing that it had otherwise established a sufficient corporate presence in other states. Thus, in that case the taxpayer company maintained regular showrooms in Chicago, Atlanta and High Point, North Carolina, to display its furniture; the company had eighteen full time employees located and acting as salesmen in other states and making sales from the displays in question; moreover, it also maintained inventories in Ohio and Michigan from which the salesmen made sales. These activities were found to be sufficient to show that it was "doing business" in other states as well as in Tennessee.

In 1959 the United States Supreme Court decided in *N.W. States Portland Cement Co. v. State of Minn.,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959)

"... that net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." 79 S.Ct. at 359.

To assist the states in taking advantage of that decision the "Uniform Division of Income for Tax Purposes Act" was drafted; it was adopted by Tennessee in 1976. This new Act repealed the old "doing business in Tennessee and elsewhere" test for determining the right of a corporation to apportion its earnings for purposes of the Tennessee excise tax and replaced it with new provisions, as follows:

T.C.A., § 67–2707:

"Any taxpayer having earnings from business activity which are taxable both within and without the state, shall allocate and apportion its net earnings as provided in this chapter."

T.C.A., § 67–2708:

"For purposes of allocation and apportionment of earnings under this chapter, a taxpayer is taxable in another state if (1) in that state it is subject to a net income tax, a franchise tax for the privilege of doing business, or a corporate stock tax, or (2) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not."

It is these new provisions which govern the right of the plaintiff in the instant case to apportion earnings for the tax years 1977 through 1979.

## B.

There is no serious dispute between the parties concerning the operative facts in this case. The plaintiff is a Delaware corporation that has been qualified to do business in Tennessee since 1961; it first qualified under the laws of Arkansas in 1939; also in 1939 it qualified to do business in the state of Oklahoma and remained qualified there until 1962; it qualified to do business in the state of Texas in 1945 and remained qualified there until 1964. Over the years its offices in Oklahoma, Texas and Arkansas were closed and moved to Memphis, Tennessee, which is now and during the taxable years here in question was the nerve center of the corporation.

Howard is a wholly owned subsidiary of Dominion Textiles, Inc., a Canadian corporation with its headquarters in Montreal, Quebec. Howard is a cotton merchant and broker and buys cotton almost exclusively for sale to Dominion Textiles or its subsidiary. During the years 1975 through 1978 approximately 98% of the cotton purchased by Howard was sold to its parent, Dominion. In 1978 Howard began to also sell cotton to another subsidiary of Dominion Textiles, to wit: Swift Industries of Georgia, and for the years following 1978 approximately 84% of Howard's sales went to Dominion and 14% to Swift Industries. The remaining sales of cotton purchased by Howard are referred to by it as "local sales."

Each year Howard contracts with Dominion for the purchase of cotton which is to be delivered according to Dominion's production needs at its textile mills. Howard then undertakes to acquire on the "spot" cotton market or by "forward contracts" the types and qualities of cotton to meet Dominion's needs. To purchase cotton Howard utilizes four full time employees known as "buyers" who purchase cotton from the Memphis office by telephone and other telecommunications or by mail. These buyers purchase cotton through independent cotton brokers, cotton merchants, and cooperatives located both inside and outside Tennessee in cotton growing regions. One-third of Howard's cotton was purchased through independent cotton brokers. During the years 1974 through 1980 Howard purchased cotton produced in the states of Arizona, Arkansas, California, Louisiana, Mississippi, Missouri, New Mexico, Oklahoma, Tennessee and Texas.

The "forward contracts" method employed by Howard to purchase cotton consists of contracts made prior to the growing season whereby a cotton broker or cotton merchant agrees to purchase the cotton which a farmer will produce on certain specified acreage. Price differentials are established for the different grades of qualities of cotton which may be thus produced. The arrangements take place through an independent cotton broker located in the cotton producing area in question. The grower signs the contract and the cotton broker mails it to Howard in Memphis and Howard's president signs the contract, retains a copy and returns a copy to the grower. When the cotton is harvested under such a contract, the grower takes the cotton to a gin where it is ginned, the bales are numbered and the bales going to Howard are designated. The cotton is then delivered to a compress which issues warehousing receipts to the grower representing the cotton stored. Each bale of cotton is identified by a warehouse receipt at the time the grower places the cotton in the warehouse. Customarily, the grower under a forward contract will either deliver his warehouse receipts to the local independent cotton broker who will prepare a sight draft enclosing the warehouse receipts and draw on Howard through a local bank for the cotton or, in some instances, the farmer will draw a sight draft on Howard. The amount of the sight draft is based on the price differentials which are found in the forward contract and which are stated in terms of the classification of the cotton.

The "spot" cotton market refers to the purchase and sale of existing bales of cotton already placed in warehouses and identified by warehouse receipts. A "spot sale" is any transaction involving a transfer of ownership of actual bales of cotton.

Howard makes spot purchases of cotton through cotton merchants, independent cotton brokers, and from farmers' cooperatives. When Howard purchases cotton, the seller, whether out-of-state or in-state, will invoice Howard attaching to the invoice the warehouse receipts, a tag listing the bale numbers and weights and classification cards. This cotton is already in a public warehouse. Upon the delivery of the warehouse receipts, Howard pays the seller for the cotton thus purchased. If the invoice and warehouse receipts are mailed to Howard, the latter thereupon mails the seller a check. Alternatively, the seller might also draw a sight draft on Howard's account at a bank in Memphis by enclosing his invoice and warehouse receipts in the sight draft and depositing it in his local bank account. The sight draft and contents would go through bank collection channels and ultimately be presented to Howard for payment in Memphis. Howard then examines the invoice, warehouse receipts, *et cetera* and if they are in order, issues a check to First Tennessee Bank in Memphis and money is then forwarded through banking channels to the depositor's bank. In some instances Howard will pay a seller by wire transfer of funds.

Cotton purchased by Howard is stored by the grower in warehouses located in the area where the cotton was grown. It is left there until it is ready to be shipped to Dominion's textile mills, the average time of storage in the warehouse being two months. Howard, of course, pays the storage charges which thus accrue on the cotton after it is purchased and until shipment to Dominion. If warehouse space is not available in the area where the cotton is grown, it will be shipped for storage in another state, generally Arkansas, upon Howard's order. All shipping orders are issued from the Memphis office.

Howard's purchases of cotton are financed through lines of credit established with certain New York and Chicago banks. Dominion maintains an open account with Howard and once each month Howard sends a statement to Dominion for cotton sold to it. Money from Dominion is paid to Howard's account with a Memphis bank or, at Howard's direction, Dominion forwards funds to pay off loans of Howard's which are maturing in New York or Chicago banks.

Howard's office is in Memphis, Tennessee, and it has no business locations outside the state of Tennessee; Howard's twelve to fourteen regular employees are located in its Memphis office where all books and records of Howard's are maintained. Howard's Tennessee franchise-excise tax returns for the years 1975–1976 indicated that 100% of its sales were "through" the Memphis office. Howard owns no real property; its office space in Memphis is leased. Except for cotton awaiting to be classed and shipped Howard's personal property is all located in Memphis, Tennessee. Howard did rent office space in Texas for two or three months during the cotton harvest season of 1976, but it otherwise has no offices outside Memphis.

In 1975–1976 the plaintiff was qualified to do business in Arkansas and during 1975 plaintiff was qualified to do business in California, Louisiana, Mississippi and Missouri. Either franchise or income taxes were paid in each jurisdiction during the time the plaintiff remained there qualified. Taxes were thus paid as follows:

|  | Arkansas | | |
|---|---|---|---|
| Franchise | — | $11.00 | 10/76 |
|  | Mississippi | | |
| Franchise | — | $85.00 | 12/75 |
|  | California | | |
| Income | — | $200.00 | 12/75 |
|  | Tennessee | | |
| Franchise | — | $1,740.00 | 10/75–9/76 |
| Excise | — | $18,433.00 | |
| Filing fee | — | $10.00 | |

The reasons advanced by the defendant for her decision to deny to the plaintiff the right of apportionment were stated as follows:

(1) Howard paid no income tax for any activities performed in any place other than Tennessee;

(2) All of the officers, directors, and regular employees were headquartered in Tennessee;

(3) Howard's business affairs were all conducted from Tennessee;

(4) There was no showing of any activity of a substantial nature carried on in any state other than Tennessee during the taxable period.

On the other hand, the plaintiff claims that it is entitled to apportion because of the following factors:

(1) Domestication and payment of franchise taxes in the state of Arkansas;

(2) Substantial contacts outside the state of Tennessee by virtue of the following:

(a) Sales to customers located outside the state of Tennessee

(b) Purchases of cotton in cotton producing areas located outside the state of Tennessee

(c) Borrowing of funds from banks located primarily in New York and Chicago for the purchase of cotton

(d) Storage of millions of dollars worth of cotton in warehouses located in other states

(e) Shipment of cotton from points outside the state of Tennessee to destinations outside the state of Tennessee.

### C.

With respect to the taxable years 1975–1976 the learned Chancellor held that under the criteria established in the hereinabove cited decisions of this Court the plaintiff had shown that during those two years it had been "doing business in Tennessee and elsewhere" sufficiently to entitle it to an apportionment of its net earnings for those years. In reaching this conclusion the Court in its findings of fact and conclusions of law stated:

"Apparently the law in Tennessee from the foregoing cases is that apportionment will be permitted where a corporation can show domestication and payment of excise taxes to other jurisdictions. It will also be permitted in the absence of domestication and payment of excise taxes to other states where they are permanent and substantial contacts shown to exist in other states.

"In 1975 and 1976, Howard was qualified to do business in Arkansas under the laws of that state and during 1975, Howard was qualified to do business in California, Louisiana, Mississippi and Missouri. Either franchise or income taxes were paid in each jurisdiction during the time Howard remained qualified. Howard warehoused the purchased bales of cotton in several states pending classing and shipment and paid substantial storage charges in those states. During the tax year in question the plaintiff, Howard Cotton Company, had an inventory of over 20,000 bales of cotton stored in public warehouses in the states of Arkansas, California, Mississippi, New Mexico, Oklahoma, Texas, Louisiana, Missouri and Tennessee. At no time was over 13% of this inventory stored within the state of Tennessee. Further, Howard leased office and classing space in Texas for the duration of the cotton harvest there, and employed someone in Texas during the cotton harvesting season to class cotton samples and arrange for shipments from Texas to Canada.

"The court further finds that Howard borrowed money to pay for cotton acquisitions either on delivery at harvest under 'forward contracts' or at time of purchase in the spot market. These loans were made from First Tennessee Bank, Memphis, Tennessee, Union Planters Bank, Memphis, Tennessee, Canadian Imperial Bank, New York, New York, Chase Manhattan Bank, New York, New York, Toronto-Dominion Bank, New York, New York and Morgan Guaranty Bank, New York, New York, during the two tax years in question, 1975 and 1976.

"The court is therefore of the opinion, and so finds, that under all the criteria established in Tennessee cases interpreting T.C.A., § 67–1701, *et seq.*, which was in effect for the tax years in question, 1975 and 1976, that Howard Cotton Company is entitled to apportion part of its

income in those years to operations outside the state of Tennessee."

We concur in these findings of fact and conclusions of law of the Chancellor.

### D.

With respect to the right of the plaintiff to apportion its earnings for Tennessee tax purposes for the years 1977 through 1979 the question is not whether the plaintiff was "doing business in Tennessee and elsewhere," for that test was repealed, but, is whether the plaintiff for these taxable years had earnings from business activity which are *taxable* both within and without the state of Tennessee. T.C.A., § 67–2707. More particularly, the question under T.C.A., § 67–2708, which defines "taxable," is whether or not states other than Tennessee *had jurisdiction* to subject the plaintiff to a net income tax regardless of whether, in fact, the state did or did not do so.

In determining whether or not the plaintiff engaged in activities in other states during 1977 through 1979 sufficient to give other states "jurisdiction to tax" the plaintiff's net earnings we turn for guidance to the decision of the United States Supreme Court in *N.W. States Portland Cement Co. v. State of Minn., supra.* Hence, we quote pertinent excerpts from that opinion as follows:

"Nor will the argument that the exactions contravene the Due Process Clause bear scrutiny. The taxes imposed are levied only on that portion of the taxpayer's net income which arises from its activities within the taxing State. These activities form a sufficient 'nexus between such a tax and transactions within a state for which the tax is an exaction.' *State of Wisconsin v. J.C. Penney Co.,* [1940, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267] *supra,* 311 U.S. at page 445, 61 S.Ct. at page 250. It strains reality to say, in terms of our decisions, that each of the corporations here was not sufficiently involved in local events to forge 'some definite link, some minimum connection' sufficient to satisfy due process requirements. [Citations omitted.] The record is without conflict that both corporations engage in *substantial income-producing activity in the taxing States* .... As was said in *State of Wisconsin v. J.C. Penney Co., supra,* the 'controlling *question is whether the state has given anything* for which it can ask return.' Since by 'the practical operation of [the] tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred * * * ' it 'is free to pursue its own fiscal policies, unembarrassed by the Constitution * * * ' *Id.,* 311 U.S. at page 444, 61 S.Ct. at page 250." (Emphasis added.) 79 S.Ct. at 365–66.

■ At this point we note that the plaintiff engaged in substantial income producing activities in Arkansas, Texas and other states during the taxable years in question, consisting in the purchase of cotton in those states, in the warehousing of cotton in those states for long periods of time, in the sale of cotton in Canada and Georgia and in the transportation of cotton from points of purchase to points of delivery, albeit these activities were directed from plaintiff's home office in Memphis, Tennessee. Of course, it is the sale of cotton that produces income but there can be no sales without prior purchases, so that, purchasing cotton is likewise an "income producing activity." Moreover, there can be no question that these other states did give something to the plaintiff for which they could ask return; the plaintiff in these various activities was protected by the law of the states where these activities occurred.

■ The fact that goods sold by a foreign corporation in the taxing state were purchased there by it through orders given from its office outside the state does not affect the authority of the state to tax the gross income of the corporation from the sale, even where the delivery of the goods to the corporation and its delivery to its customers were simultaneous. *Department of Treasury v. Wood Preserving*

*Corp.,* 313 U.S. 62, 61 S.Ct. 885, 85 L.Ed. 1188 (1941).

■ The power of a state to impose a tax on transactions within that state is not affected by the mere fact that the exaction of the tax is contingent upon events occurring outside the state. *State of Wisconsin v. J.C. Penney Co.,* 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940).

■ To be valid a state tax on, or measured by, the income of a foreign corporation which engages both in taxable activities within the state and nontaxable activities without the state must be apportioned or allocated to its activities within the taxing state. *N.W. States Portland Cement Co. v. State of Minn., supra.* But, the practical impossibility of a state's achieving a perfect apportionment of complex business activities, has been recognized and it is held that a rough approximation is sufficient; precision is not required. *International Harvester Co. v. Evatt,* 329 U.S. 416, 67 S.Ct. 444, 91 L.Ed. 390 (1947). The guiding principle is that a state may not tax value earned outside its borders; the broad inquiry is whether the taxing power exerted by the state bears fiscal relation to the protection, opportunities, and benefits given by the state; the simple and controlling question is whether the state has given anything for which it can ask return. *ASARCO, Inc. v. Idaho State Tax Com'n,* 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982). *See, also, Sjong v. State, Dept. of Revenue,* Alaska, 622 P.2d 967 (1981).

■ Applying the new apportionment statute in light of these principles, the Chancellor determined, and we agree, that the plaintiff was entitled to apportionment for the taxable years 1977 through 1979. In reaching that conclusion, he gave the following explanation in his findings of fact and conclusions of law, to wit:

"The rules of the Tennessee Department of Revenue, Franchise and Excise Tax Division, promulgated pursuant to T.C.A., § 67–101, Section (2), specifically Rule 1320–6–1.25 Section (3) explain this test as follows:

'The second test, that is, § 67–2708, paragraph (2), applies if the taxpayer's business activity is sufficient to give the state jurisdiction to impose a net income tax by reason of said business activity under the constitution and statutes of the United States.'

"Thus the new Tennessee Act no longer requires actual payment of taxes in other states, but merely requires that the taxpayers' business operations in other states be sufficient to give to the other states jurisdiction under the United States Constitution to impose a tax on those operations, whether taxes are actually assessed or not.

"Under the uncontested stipulated facts in this case, it is clear that in each of the tax years in question Howard Cotton Company owned millions of dollars worth of cotton which was warehoused in public warehouses in other states. In addition, Howard engaged in related business activities outside the state of Tennessee, that is, virtually all cotton purchased by Howard was brought from sources outside Tennessee; virtually all sales made by Howard were made to customers outside Tennessee; virtually all shipments made by Howard were from a point outside Tennessee to a destination outside Tennessee; and most of the money borrowed by Howard to conduct its operations was borrowed from sources outside Tennessee.

"States in which cotton was purchased and stored, pending sale and delivery, do have jurisdiction to tax Howard's operation. The Tennessee Supreme Court has held that storage of a company's product in warehouses and delivery in Tennessee gives the state jurisdiction to tax. *R.J. Reynolds Tobacco Co. v. Carson,* [187] 197 Tenn. 157, 213 S.W.2d 45 [1948]; *Sealed Power Corporation v. Stokes,* 174 Tenn. 493, 127 S.W.2d 114 [1939]. Further, the U.S. Supreme Court has held that storage of a taxpayer's cotton in public warehouses in a state gives that state jurisdiction to tax. [*Chassaniol*]

*Chassinol v. Greenwood,* 291 U.S. 584 [54 S.Ct. 541, 78 L.Ed. 1004 (1934)]; *Federal Compress Co. v. McLean,* 291 U.S. 17 [54 S.Ct. 267, 78 L.Ed. 622 (1934)]. "The court is accordingly of the opinion, and so finds, that Howard Cotton Company is entitled to apportion under the act, T.C.A., § 67–2707, for the tax years 1977, 1978 and 1979."

With these findings of fact and conclusions of law of the Chancellor, we agree.

The decree of the Chancellor is affirmed. Costs incurred upon appeal are taxed against the appellant.

FONES and DROWOTA, JJ., concur.

HARBISON, J., filing concurring opinion in which COOPER, C.J., also concurs.

HARBISON, Justice, concurring.

I concur in the result reached by the majority but for somewhat different reasons. In my opinion, the contacts shown by this taxpayer with other states are minimal and are less substantial than those shown in most cases where apportionment has been allowed. The taxpayer has no employees, officers or property in any other state, except inventory being stored for shipment to plants owned by its parent in Canada. Except in isolated instances, it makes no sales and derives no income from operations in other states. It pays only minimal taxes to any other state. Such operations as it has in other states are conducted through independent agents or public warehouses, and not through its own employees. All operations are centered in and controlled from Memphis.

Unlike the situation in *Allenberg Cotton Co., Inc. v. Woods,* 640 S.W.2d 543 (Tenn. 1982), the taxpayer on its excise and franchise tax returns showed all of its sales being made through the Memphis office. The Commissioner has not questioned the figures used in the apportionment formulae by the taxpayer, as was the situation in *Allenberg* where some apportionment was permitted. Rather, the Commissioner has questioned the right of the taxpayer to apportion at all.

The Commissioner, however, has not challenged the right of the taxpayer to apportion for purposes of the state franchise tax. At all times pertinent to this case, both before and after 1976, the corporate franchise tax statute has permitted apportionment to corporations "doing business in Tennessee and elsewhere ...." T.C.A. § 67–4–909. The taxpayer reported its liability for franchise taxes on the same form and at the same time as it reported its liability for excise taxes. During 1975 and 1976, the right to apportion excise taxes was accorded to corporations "doing business in Tennessee and elsewhere"—in identical terms to the franchise tax statute. I am not aware that in previous cases the Court has made any distinction between the two taxes with respect to the criteria for apportionment. If the Commissioner deemed that appellee was entitled to apportion its franchise taxes for 1975 and 1976, then, under the excise tax statute, for those years it seems to me that there is difficulty in denying apportionment for excise tax purposes. The State seems to be attempting to tax all of the corporation's net earnings while agreeing that portions of the corporate franchise value are properly allocable elsewhere.

Further, the taxpayer had domesticated its charter in five other states for all or most of the calendar year 1975. Although minimal, it did pay taxes to several of those jurisdictions. Accordingly, for the first portion of the audit period, I do not believe that the Commissioner was justified in denying apportionment, although the issue is quite close under our previous cases.

With respect to the years 1977 through 1979, the question is somewhat different because of a change in the provisions of the excise tax statute. In 1976 the General Assembly adopted the Uniform Division of Income for Tax Purposes Act and expressly stated that some of its basic definitions "shall be interpreted consistently" with the intent of the National Conference of Commissioners on Uniform State Laws. T.C.A. § 67–4–804.

Since the 1976 revision, corporations have been entitled to apportion net earnings for excise tax purposes on a somewhat different standard from that contained in the earlier statute, the apportionment provisions being substantially revised and differing from those in the franchise tax law which have remained unchanged. T.C.A. § 67–4–809 controls the audit period from 1977 through 1979. Subsection (a) permits apportionment to taxpayers "having earnings from business activity which are taxable both within and without the state .... " Taxability of business activity, therefore, is the criterion, rather than "doing business in Tennessee and elsewhere."

More specifically, under subsection (b), a taxpayer is deemed to be taxable in another state if that state has jurisdiction to levy a net income tax upon it, as discussed in the majority opinion, or, alternatively, if it is subject to certain other taxes. Subsection (b)(1) permits allocation and apportionment of earnings if a corporation is subject in another state to:

1. a net income tax;
2. a franchise tax measured by net income;
3. a franchise tax for the privilege of doing business; or
4. a corporate stock tax.

There is no question in this case but that appellee paid a corporate franchise tax to the State of Arkansas for the years 1977 through 1979, as well as for many years previously. That tax is levied for the privilege of doing business in corporate form in that state. Ark.Stat.Ann. § 84–1801 (1980). Further, appellee had domesticated its charter in that state during each of these three years; it has been continuously so domesticated since 1939.

The Arkansas corporate franchise tax is levied upon corporations which are either organized in Arkansas or have qualified under the laws of that state. Each corporation is required to file a tax return, as appellee did, and to allocate to Arkansas a portion of the par value of its capital stock, computed upon the percentage of its property in the state of Arkansas to the total

value of all of its property. Ark.Stat.Ann. § 84–1835(f) (1980).

Appellee, in its returns, showed substantial assets in Arkansas at the end of each taxable year, consisting of inventories stored in warehouses. It allocated the value of its capital stock to Arkansas based upon the proportion of these assets to all of its property.

The Tennessee Commissioner has not questioned the good faith of the taxpayer in paying Arkansas franchise taxes. If it is indeed subject to those taxes, then under T.C.A. § 67–4–809(b)(1) appellee is entitled to apportion its earnings for purposes of the Tennessee excise tax.

I have difficulty in concluding that appellee was subject to a net income tax in Arkansas during any of the years 1975 through 1979. Arkansas has a general income tax law applicable to corporations as well as individuals. Ark.Stat.Ann. §§ 48–2001 to 2094.2 (1980). Appellee filed sworn income tax returns in Arkansas for each of the years in question, and in each year showed the same amount of total gross sales as were shown on the Tennessee franchise and excise tax returns. It showed none of these allocable to Arkansas, and it reported no taxable income applicable to that state in any tax year involved. Arkansas apportions income among states in accordance with the Uniform Division of Income Act. Ark.Stat.Ann. § 84–2057 (1980).

To me it seems inconsistent for the taxpayer to insist in Tennessee that it is subject to net income taxation in Arkansas and other states while it at the same time filed tax returns in Arkansas denying all income tax liability there. As far as the record shows, it filed no income tax returns in any other state and has made no showing that any other state than Arkansas could subject it to a net income tax. Accordingly, in my opinion, any entitlement of appellee to apportionment under the revised Tennessee excise tax statutes arises solely from its having, apparently properly, paid Arkansas franchise taxes.

The Commissioner correctly points out that if a taxpayer voluntarily pays nominal franchise taxes in other states to which it is not actually subject, this circumstance has little weight in establishing a right to apportion. *Signal Thread Co. v. King*, 222 Tenn. 241, 435 S.W.2d 468 (1968). In this case, however, the taxpayer, a Delaware corporation, has had its charter domesticated in Arkansas since 1939. In good faith it filed returns and paid franchise taxes to Arkansas during each year involved in the audit, long before any question of its right to apportionment was raised.

The most appealing argument of the Commissioner in this case is that the taxpayer, which apparently is doing practically all of its business in Tennessee, is paying income taxes to Tennessee based on only 36% of its net earnings, and is not paying any amount whatever to any other state on the remaining 64%. Nevertheless, contrary to the insistence of the Commissioner, under the provisions of the revised Tennessee excise tax statute, payment of taxes to other states based on net income does not appear to be the sole criterion for apportionment. The taxpayer must have earnings from business activity which are taxable both within and without this state, and T.C.A. § 67–4–809(b)(1) expressly states that a taxpayer is entitled to allocate and apportion its earnings if it pays "a franchise tax for the privilege of doing business" in another state. Obviously, this means something other than "a franchise tax measured by net income" which in the same subsection is separately made a basis for apportionment.

The Commissioner contends that the criteria for apportionment under the revised excise tax statute are essentially the same as those under the previous one allowing apportionment for corporations doing business in Tennessee and elsewhere. Were subsection (a) of T.C.A. § 67–4–809 the only provision regarding apportionment, this argument would be plausible. The specific provisions of subsection (b), however, are different. Further the legislative debates make it clear that the intent of the General Assembly was to adopt a uniform act differing materially from the earlier statutes.

The taxpayer has contended that for Tennessee to deny it the right to apportion its earnings would violate the commerce clause or other constitutional provisions. Upon this record such a contention would be difficult to sustain. If all of the audit years in question were governed by the previous statutes, in my opinion almost all of the taxpayer's earnings could properly be subjected to the Tennessee excise taxes for 1977 through 1979, and quite possibly for 1976 as well. As previously stated, however, while not necessarily controlling, it is somewhat troubling that the Commissioner has challenged the right of appellee to apportion its earnings for excise tax purposes but has apparently conceded its right to apportionment for franchise tax purposes during each year.

The Commissioner has not undertaken in this case to reallocate income under the relief provisions of the excise tax statute, T.C.A. § 67–4–812, although this might have been possible. In the case of *Deseret Pharmaceutical Company, Inc. v. State Tax Commission*, 579 P.2d 1322 (Utah 1978), a corporation had its only place of business within the state of Utah. It did solicit business from out-of-state customers, however, through traveling salesmen. Other states were precluded from taxing income resulting from those sales by the federal statute referred to in the majority opinion. Under these circumstances, the Utah Supreme Court affirmed the Commission in using the relief provisions of the Uniform Division of Income for Tax Purposes Act (identical to T.C.A. § 67–4–812(a)) and allocating most of the earnings of the corporation to the state of Utah.

This statute permits departure from the normal apportionment factors in order "to effectuate an equitable allocation and apportionment of the taxpayer's earnings." T.C.A. § 67–4–812(a)(4). The Commissioner, however, has not undertaken to challenge the percentages used by the taxpayer or the other details of the statutory appor-

tionment factors, but has cast the present case upon an all-or-nothing basis.

In the *Deseret Pharmaceutical* case, *supra*, the taxpayer paid nominal taxes to two other states. One of these was a franchise tax for the privilege of doing business in the state of Washington; the other, a corporate stock tax in the state of Texas. Neither of the taxes was determined by or based upon net income. The Utah commission, however, allowed apportionment of income. It excluded from Utah these earnings specifically shown to be allocable to Washington and Texas. The Supreme Court of Utah affirmed. Under the standard apportionment formulae used by the taxpayer, less than 50% of the corporation's earnings had been attributable to Utah.

In the present case, neither in the trial nor on appeal, has the Commissioner sought to invoke the relief provisions or to revise the percentages of apportionment claimed by the taxpayer.

Therefore, with reluctance, I concur in affirming the judgment of the Chancellor.

I am authorized to state that Justice COOPER joins in this opinion.